ALLISON vs. HUNTER.

1. When a patent is issued, by an officer who has authority to issue it, the law presumes that all the prerequisites necessary to its issuing have been complied with; and irregularities in the acts of the officer, cannot be enquired into, except upon a direct application by the U. S. to vacate it.

2. The receipt of a receiver is *prima facie* evidence that the law has been complied with. It does not, however, stand upon the same footing with a patent, and it may be shewn by parol evidence to be void.

3. Land to which A was entitled to a pre-emption right, could not be entered at private sale by B; and A having applied to prove his pre-emption right, and being prevented by the officer under the impression that the land was not subject to a pre-emption, an entry of the land by B while subject to the pre-emption of A is void.

4. A pre-emption right need not be proved up, and a certificate thereof obtained, to enable the party to defend in an action of ejectment.

## ERROR to Pike Circuit Court.

CARTY WELLS, for Plaintiff.

The plaintiff in error relies on the following points :

1st. The evidence offered was legal and relevant, and ought to have been given to the jury. Whether sufficient to prove the facts relied on, was for the jury, and not the court.

2d. The facts sought to be proved were sufficient to defeat plaintiff's entry. See the late case of Hill vs. Groom. If the entry was fraudulent it was void; if the land was not subject to entry, it was void; if it was reserved from sale, the entry was void; if it was subject to entry, it was also subject to Watson's pre-emption, which would prevail over the entry.

W. M. CAMPBELL, for Plaintiff.

Allison has given evidence conducing to show that he has a good claim under the pre-emption law, and was in a situation to assail the title of Hunter for fraud.

The receiver's receipt of Hunter, is only *prima facie* evidence of title, and may be avoided by proving that it was obtained by fraud, or was issued in violation of law.

The evidence conduces to prove that Hunter was guilty of fraud, and suppression of the truth, when he took advantage of the absence of

Allison vs. Hunter.

Wm. Wright, deceived Willis Green, and obtained the certificate of entry, knowing it to be reserved from sale.

The entry is void, because it never did receive the assent of the register, express or implied; but on the contrary, the pretended sale by Green was disapproved of, and repudiated by Wright, so soon as it was known to him, and was also disapproved by the commissioner of the land office so soon as he was informed of the facts of the case. No valid sale was made to Hunter, for the want of assent on the part of the proper officer.

The sale was illegal, and improper, because the land had long been withheld from sale, and could not be properly entered at private sale, until it had been again offered at public sale.

The commissioner of the general land office possesses authority to make rules, and to prescribe the manner in which entries should be made; also to decide when sales shall be suspended, in order to prevent improvident entries, and conflict of titles.

It is the duty of the commissioner of land titles to suspend, and withhold patents, and cancel entries when satisfied that they have been obtained by fraud, or unlawfully issued.

The decision of the officers of the general land office, should not be disregarded by the courts of justice, without strong reasons therefor, because it is much easier for the courts to conform their decisions to the established usages, and regular and settled practice of the land office, than for the land office department to conform its actions to the variant and conflicting decisions of all the courts of the United States, and of the courts of fifteen or sixteen States and Territories, that contain public land.

The concurrent opinions of Messrs. Wirt, Butler, Berrien, Taney, Crawford, and Whitcomb, in relation to fraudulent and unlawful entries, and the powers and duties of the land officers in relation thereto, are entitled to high respect, not only as the opinions of eminent lawyers, and profound jurists, but also because given officially, in conformity to law, to regulate the conduct of the ministerial officers, and to build up and establish a regular system for the disposal of the public lands.

If the land was a part of Dubreuil's claim, then it was not subject to entry; and even if Dubreuil's claim had been decided to be invalid, and the same had again become public land, it would not be subject to private entry, until again offered at public sale.

If Dubreuil's claim was not valid, then the pre-emption claim of Watson, under which Allison claims, was sufficient to hold the land.

---

Allison vs. Hunter.

---

The pretended entry of Hunter was invalid, because Allison had a pre-emption thereon, and it had been previously withheld from sale.

The conveyance from Dubreuil to Watson, of itself, constitutes a good equitable title in Watson, if the claim of Hunter be bad, and having such a title, he is in a position in which he may successfully assail the title of Hunter for fraud and illegality.

In ejectment, a defendant may avoid a deed for fraud.    1 Marshall, 425; 5 Littel, 186.

Glover & Campbell, and Uriel Wright, for Defendants.

We insist that the judgment of the circuit court ought to be affirmed. We shall endeavor to establish certain propositions of law and fact in the case, and by the light of these, examine the *evidence* which the plaintiff in error contends was excluded by the court.

1st.  The acts of all public officers performed within the scope of their general authority, are *prima facia* valid ; and it is presumed, that all the requisite steps have been taken legally to consummate such acts.

2nd.  It follows from this, that if there be any preliminary named in· a statute to the performance of such act, which is deemed of sufficient importance to defeat the act if omitted, the burthen of showing such omission, is on the party seeking to aviod the act.

3rd.  Conceding the land was never offered at public sale, the entry is not necessarily void.    In the exercise of a power conferred by stat·· ute, it is not every omission to comply with the provisions of a statute, which will defeat the act of the officer.    "Statutes are sometimes directory, and in such case, a breach of the condition works no forfeiture of the act done."    1 Kent. Com. 465.    Provisos in a statute, do not always amount to a condition.    2 Cow. & Hughes Dig. p. 1884, c. No. 4.    Where a statute directs an officer to do a thing in a specified time, without restraining him against doing it afterwards, the act constitutes no limitation on the power of doing it afterwards.    8 Mass. 230.    The essential requisites of a statute must be complied with, or an act done under it will be void: otherwise, where the statute is directory.  5 Hill, 16.    Thus, statutes prescribing the manner of proceeding in the collection of debts, as that slaves shall not be seized, and sold under execution, until the remaining personal estate is exhausted; that real estate shall not be sold until all the personal estate is exhausted; that property neither real nor personal, shall be sold until duly advertised,

have been considered as merely directory in these particulars, and official acts done in contravention of these provisions held valid in favor of innocent purchasers.   3 Bibb, 216, 202, 518; 1 Blackf. 212; 2nd Blackf. 295; 8 Cow. R. 282; 13 Ibid. 11, cited in 4th Kent. Com. 5 ed. note a, page 430; 1 Mo. R. 543; 2 Bibb. R. 401; 3 Marsh. 282, 619; 2 J. J. Marsh. 36, 68.   There is a distinction between a sale without authority, and one, where there is an authority not strictly pursued.   "A purchaser is not bound, or otherwise affected by the irregular acts of an officer, when he has no notice of the irregularity, and does not connive at, or participate in the same.   1 Bibb. R. 155 ; 1 Mun. R. 95.   3 J. J. Marsh. 439 ; 4 Mun. R. 465, 474.

It is believed and insisted, that the case at bar falls within the bearing of the cases, and principles cited ; and that at most, the requisitions of the acts of Congress, with reference to an offer at public sale before a private entry, are mere prudential directions to the officers of the land department, which may devolve a personal responsibility upon them, but never were intended to create a precedent condition, to a valid disposition of a tract at private entry.   The defendant will endeavor to show that this conclusion is inevitable from a general view of the legislation on this subject.   See Land Laws, Instructions and Opinions, part 1, act of Congress, May 18th, 1796, p. 50 ; March 2, 1799, p. 61   March 1, 1800, p. 65 ; May 10, 1800, p. 72 ; March 3; 1803, p. 97; March 3, 1803, p. 100; March 26, 1804, p. 107; April 21, 1806, p. 142; Feb'y 21, 1806, p. 130; March 3, 1807, p. 161; Feb'y 29, 1808, p. 163; March 31, 1808, p. 166; June 15, 1809, p. 172; April 30, 1810, p. 176; Feb'y 15, 1811, p. 184; March 3, 1811, p. 192–4; April 26, 1816, p. 273; April 27, 1816, p. 277; April 29, 1816, p. 279; March 3, 1817, p. 288; Feb'y 17, 1818, p. 294; March 18, 1818, p. 297; April 20, 1818, p. 306; March 3, 1819, p. 315; March 3, 1819, p. 318; April 24, 1820, p. 324; March 3, 1823, p. 364; March 3, 1823, p. 370–371; May 26, 1824, p. 384; May 26, 1824, p. 393; Feb'y 19, 1831, p. 481; June 25, 1832, p. 501; July 10, 1832, p. 508; March 2, 1833, p. 516; June 26, 1834, p. 528–9; July 7, 1838, p. 581 and 579.

4th. That if it were otherwise competent to show the fact, that the land had never been offered at public sale, *oral* testimony ought not to l a ·e been received in the case; all the considerations of public policy and convenience forbid such a construction of the law, as would have the effect of suspending every land title in the country, prior to the emanation of a patent upon so unsubstantial a foundation.   That it has been repudiated in like cases ; see 1 Harr. & McH. p. 187; 1 Harr & John., 349; 2 Har. & John. 132; 4 Har. & McH. 420; 6 Mo. Rep. 106.   This

court declare the incompetency of such proof.   In the case of Craig vs. Preston. Lit. Sel. C., 141, the supreme court of Kentucky declare, that such a construction of a law of Virginia ought not to be made, as would allow the introduction of parol evidence, to show that a land warrant did not issue in conformity to law.

5th.  The power of cancelling an entry with the register and receiver, has never been conferred upon the commissioner of the general land office.   5 Mo. R. 355; 9 Ib. 190–1.   The cancelment of Hunter's certificate, therefore, if in fact it has been done, was a lawless act, which the circuit court properly disregarded.

6th.  Should we grant the power of the commissioner to cancel by his arbitrary will, without notice, without a jury, without evidence, in the absence of the party, and without any right of appeal to any other tribunal ; the best evidence of such cancelment was not offered to the circuit court, and the mere letters of the commissioner were properly rejected.   If the cancelment was evidenced by a record of his office, he should have certified it under his official seal.   See Public Land Laws, Instructions, and Opinions, part 1, p. 212.   If it were a matter *in pais*, Hunter had the right that he should be sworn and cross-examined ; in no event could his letters, or the letters of other persons, an almost countless number of which were offered to the court, be received as legal evidence in the case.   5 Wheat. 293.

7th.  The confirmation to Antoine Dubreuil of 10,000 arpents, by the act of July 4th, 1836, was not in itself, evidence of anything against Hunter's title ; there was no evidence offered to the court that the claim was filed with the proper officer earlier than the 13th Nov. 1811, consequently it was not reserved from sale by the act of Congress March 3, 1811.   If it was protected by the act of Congress May 26, 1824, and the acts in continuance thereof, the neglect of the claimant to accept the benefit of said acts, and the expiration of his privilege under them on the 26th of May, 1829, again created a bar which was in full force on the 11th July, 1831, when Hunter entered it.   The act July 9th, 1832, could not divest the right which Hunter had acquired, even if it embraced Dubreuil's claim, which is denied, since it was not filed in time. Stoddard and Chambers, 2 Howard S. C. R. 313 ; 8 Mo. R. 88 ; 6 Mo. R. 10.

Such being the condition of Dubreuil's confirmation, it was properly treated as a nullity by the circuit court ; it was not even pretended that it was filed in time to be embraced either by the act of March 3, 1811, or the act of July 9, 1832.   After the rejection of the supposed confirmation, the offer of Dubreuil's title bond, or even his deed, without any

explanation, would have been properly rejected.    Hart vs. Rector, 7 Mo. R. 531.

8th. The certificate of N. P. Taylor, register of the land office at St. Louis, was offered in evidence for the purpose of showing that in 1818, the claim of Dubreuil was certified to his office for some purpose by Frederick Bates, recorder of land titles.   If this certificate was evidence at all, it was but secondary evidence ; and no ground-work being laid for its introduction, it ought to have been excluded from the jury

The fact that the claim was on file in Bates' office in 1818, certainly. did not even tend to prove that it was there prior to the 1st July, 1808, the last day on which it could be filed.   The evidence of a filing should have come from the recorder's office,  and nothing but a certified, or sworn copy of the certificate of filing, was sufficient, while presumption of its existence remained.    In 3 Philips, p. 1065, note 720, it is stated that a copy of a copy is not evidence.   This is a copy of a mere abstract.

9th. Oral testimony of the supposed right of pre-emption in Watson, was in the manner it was offered, properly rejected.

"Secondary evidence cannot be given, until all reasonable means of procuring the primary evidence are exhausted."    1 Philips' Ev. 454. The loss or destruction of documentary evidence, is always a pre-requisite to be established to the satisfaction of the court, before any proof of the existence, or contents of the document is permitted to go to the jury." 16 John. R, 8Mo. R. 116.   "The proper depository must be diligently and thoroughly searched."    "When the last instrument has been traced into the hands of an individual, he must be subpœnaed." "That he said he could not find it, is not sufficient."    "He must have searched for it, in such place as it might reasonably be expected to be found; and must himself be called to prove the search, and that it was ineffectual."    If the person is dead, a similar inquiry and search must be made among those who succeeded to his papers, or might otherwise be supposed to have come to possession of the last document. 1. Philips' Ev. 456; 6 T. R. 236; 3 Ib. 1223.    It was the duty of the court to determine, whether there was sufficient evidence of the loss, or destruction of the record of Watson's pre-emption right; it will appear that the evidence on this point was wholly unsatisfactory, and the court committed no error in refusing to let the matter offered, go to the jury.

10th. The testimony on the subject of the pre-emption right of Watson, was properly excluded on other grounds.    The act of May 29, 1830, expired in one year from its date, and with it, as we contend, the

rights of Watson.  See Public Land L., Instructions and Opinions, p. 1. p. 474.  It is not pretended, that any proof was filed until the 21st Sept. 1832.  The plaintiff in error seeks to remove this objection by oral testimony, that had the officers of the United States done what he conceives to have been their duty, he could have produced evidence of a right derived from the law.  In other words, his title is based, not on what the United States have done, but what they should have done. This court has always refused upon the soundest considerations, to recognize such doctrine. 9 Mo. R. p. 185.  Again.  The act of congress May 29th 1840, contemplates that payment should be made on filing proof under it, and on failure, the right was forfeited.  See Pub. Land L., In. & Op., P. 2, p. 547; Ib. 559–555–6; and here again this court will be called upon by the plaintiff in error, to decide and enforce what would have been the right of Watson, had the register and receiver done their duty.  See 13 Peters, p. 515; See act Congress, July 2nd, 1836.  Again.  If it was legally competent for the register and receiver, on the 21st Sept. 1832, to allow the right of pre-emption claimed by Watson, in virtue of the act 29th May, 1830, and after the expiration of that act, it could only have been upon strict compliance with its provisions; a tender of payment, at the filing of his proof, was absolutely necessary; for the want of this his right became forfeited.

Lastly.  Watson forfeited his right, by selling his right in violation of the provisions of the Statute, and removing out of the State prior to paying, or offering to pay for the land.  2 Public Land Laws, Ins. & Opins. p. 117, No. 77.  The defendant denies the legal validity of this instruction, in attempting to extend the provisions of the law beyond the time fixed in it.  But if they were legal, the right was not saved under them.

11th.  Allison having shown to the court no legal evidence of an outstanding title in any one, it must be presumed that no such title exists, and that he can't oppose nothing but a mere naked possession to the plaintiff's title.  Will he be permitted in this state of the case to assail the plaintiff's entry for fraud?  We think not. 6 Mo. R. p. 106.  He could not do so, even if he had entered the land.  See 1 S. C. R. 156; 3 Ib. 99.  This court have decided, in 9 Mo. R. 182, that after patent has issued, they will decree the legal title out of the patentee, in favor of him who holds the superior equitable title; but that they will not decree the mere equity.  The reasons of that case appear to apply with equal force to an action at law, where there are conflicting entries, and urge us to the conclusion, that in such case the oldest entry should prevail till the patent issues. 1 S. Car. R. 160.  But however this may be, it

Allison vs. Hunter.

would seem that if the defendant has no right involved in the contro-versy, he should not be permitted to complain of an injury; possibly in the case of two entries, or other inchoate titles, derived from the United States, the State courts might consider themselves compelled to decide between the parties; but where there is no conflict, it is difficult to see how the court can nullify the only title before them, without in-terfering "with the primary disposition of the soil." See 13 Peters, 451 and 516. A receiver's receipt is sufficient evidence as against a trespasser, or one standing on a naked possession. See also 1 Mo. Rep. 236.

Scott, J., delivered the opinion of the court.

Hunter sued Allison in an action of ejectment, in which he obtained judgment. The title of Hunter was a certificate of the United States Receiver.

Allison claimed under Watson, and offered to prove, amongst other things, that the entry was fraudulent and void for the want of authori-ty in the officer to issue, for the reason that the land, at the time of the entry, was subject to the pre-emption claim of Watson; and that the land was not subject to private entry at the date of the certificate, be-cause it had never been offered at public sale, proclaimed by the Pres-ident of the United States. All this evidence was rejected, and its re-jection is the ground on which a reversal of the judgment is sought.

The tract of land in controversy, it seems, is a portion of a large Spanish concession made to Antoine Dubreuil, which was reversed from sale by the 10th section of the act of Congress of the 3rd of March, 1811, providing for the final adjustment of claims to lands in the terri-tories of Orleans and Louisiana, notice of the claim having been pre-viously filed with the recorder of land titles, in pursuance of the laws of the United States. The reservation of Dubreuil's claim continued until the expiration of the act of 26th May, 1824, enabling claimants to institute proceedings to try the validity of their claims, and the several acts amendatory thereto, which occurred on the 26th of May, 1830.

It appears that the secretary of the treasury on the 10th of June, 1818, caused the recorder of land titles to furnish to the registers and receivers of the several land offices, a list of all the claims in the sev-eral land districts which had been reserved by the acts of March 3, 1811, above referred to, with a view to prevent the sale of them. Upon being furnished with the lists, the lots reserved were designated by pen-

oil marks on the plats of surveys used in selling the lands. As offices were afterwards created, the plats thus marked were furnished to the newly created offices. The act of 26th May, 1824, by which the Salt River Land District was created, and which, it seems, was formed from the St. Louis Land District, directed that the lands theretofore offered for public sale at St. Louis, should be subject to private entry, and be sold by the officers of the land office thereby created.

The land in dispute was entered by Hunter on the 11th July, 1831, after the reservation imposed by the act of 1811 had ceased to exist. Watson, under whom the defendant claimed, settled on the land in 1823 or '4, and continued to reside upon it, until the autumn of 1835, when he sold to Allison, the defendant. During the existence of the act of 28th May, 1830, which conferred a right of pre-emption on the settlers of the public lands, Watson applied both to enter the land in dispute, and prove his right of pre-emption thereto, but he was not permitted so to do. Hunter, the plaintiff, applied to the register to enter the same land and was refused leave ; and afterwards, in the absence of the register, caused it be entered with the receiver, with whom blank applications signed by the register had been left.

Evidence was also offered conducing to show that the entry made by Hunter had been cancelled by the commissioner of the general land office.

Let it be borne in mind that this is not a controversy involving the legal title to land. It is a contest between an entry and a pre-emption right. It is an attempt by one individual to turn another out of his possession, when the legal title is in neither of them. It cannot be denied that when a patent issues, the law presumes that all the pre-requisites necessary to its emanation have been complied with, and if there is authority in the officer to issue it, irregularities in his conduct cannot be enquired into but in a direct proceeding on the part of the government to vacate it. But when a patent is absolutely void, for whatever cause, it will be regarded and treated as a nullity in all proceedings. Nor can it be gainsaid that when a patent has been issued for lands subject to sale, all enquiry into the fact whether the land conveyed by it has been regularly proclaimed for sale, is precluded in any collateral action. It must likewise be admitted, that when a receiver gives a receipt for the purchase money of a tract of public land, that receipt is *prima facie* evidence ; the presumption is that the law has been complied with, and if nothing can be shown against its validity, it will prevail. If the officer has authority to issue it in the particular case, any irregularity in his conduct which may affect the interest of the government, cannot be

taken advantage of by a third person. But while we say this, we do not maintain that a settler on the public lands can be expelled without authority of law. It is not sufficient that he who would turn another out of his home, should only produce a written formula. A certificate of entry, which has a mere physical existence, is no more than a blank page of the Alcoran, unless it is warranted by law. . Unless the officer has authority to give it, it may be shown to be a nullity whenever it is set up to affect the rights of any one. A receiver's receipt does not stand upon the same footing with a patent. A patent confers a perfect legal title. When a party is in under it, no higher title can emanate from the government to disturb him. A receipt is an authority to demand a patent; it is strictly scrutinized, and if not warranted by law, it is disregarded, and not suffered to be made the foundation of a legal title. If a certificate is cancelled by the commissioner of the general land office, his judgment is not conclusive on this court in a contest between titles like those now before us; but when we find his act warranted by law, why endeavor to thwart it? Why put one into possession of land at the expense of another, when it is apparent that no title will ever be conferred on him, and when we can see that it is right it should be so? 5 Black. 55.

It is of importance that some control should be retained by our courts over the conduct of the land officers. It would be unwise to proclaim from this tribunal that they may act as they please towards the settlers on the public lands, and that courts will give full scope and effect to their lawless designs. Such a principle would encourage them to oppression. The consciousness that their acts could not be made bare, and their motives exposed in a court of justice, might incline them to listen to the entreaties of a speculator, who would expel a poor man from his home, and rob him of the sweat of his brow. It is useless to say that such conduct would meet with its deserts from the federal government. That government is too remote, and approached with too much difficulty by the great mass of those who would suffer by the misconduct of the land officers, to be looked to for protection; and moreover, the settlers having been expelled from their possessions, would deem it preferable to go and seek other homes, than to be spending their scanty means in litigation.

Can the validity of this certificate comport with the existence of the pre-emption right of Watson? for, as evidence was offered to prove that Watson, at the time of Hunter's entry, was entitled to a pre-emption under the act of 29th May, 1830, it must be assumed for the purposes of this argument that such was the fact. Then, according to the

settled construction of that law by the officers of the general government, and the courts of the western country, that entry was invalid ; Mosier vs. Smith, 5 Black. 55; Isaacs vs. Steele, 3 Scam. 101. But it is said that the pre-emption right, not having been proved up before the expiration of the law, and a certificate thereof obtained, no right can now be asserted under its provisions. Let it be remembered that an offer was made to prove the pre-emption in time, but the claimant was not allowed to do so, because the land was reserved. Now if Hunter could enter, it is clear that Watson was entitled to a pre-emption. Even if the land was not subject to private entry, yet Watson held a pre-emption on it, when it was ascertained that it was not a private claim. Hunter has entered the land, and his title can only be supported by the assertion of a state of facts which show that, at the time of his entry, Watson was entitled to the land. If Watson was prevented during the existence of the law, from proving his pre-emption, his inability to do so, could have no effect in giving validity to an act which could not legally be performed. The injustice of the officers, in refusing him permission to prove his right, cannot give efficacy to the void entry of Hunter. Watson never abandoned his right; he did all he could to perfect it, but was prevented by those who afterwards illegally permitted Hunter's entry. It may be said that a pre-emption right can only be evidenced by the certificate of the register and receiver, and there being no such evidence here, its existence is not legally shown. Our statute gives a right to maintain an action of ejectment on a pre-emption right. Of course, then, a pre-emption right will defend an ejectment against one not having a better right. It is well settled that the pre-emption act of 29th May, 1830, gave a right of pre-emption to lands subject to private entry, and that act continued in force one year, during the whole of which pre-emptors might prove their claims.

If a pre-emption alone, without any other evidence than the facts necessary to confer it, could not be set up as a defence against a certificate of entry, the benefits of the law would be entirely lost to those who settled on the lands subject to private sale; and a statute that was designed to give the poor, whose means had been exhausted in coming to the country, a little indulgence to enable them to pay for their homes, would be rendered a dead letter. If the entry can prevail over a pre-emption, unless shown to exist by a certificate of the register and receiver, then every pre-emptor would be compelled to prove his claim immediately in order to defend himself, or otherwise lose it; and thus a construction is put upon the law which takes away every advantage proffered by it. The idea of a statute being a title paper, is not novel

in our jurisprudence. Many persons in this State hold their lands by act of Congress alone. The claimants under the act of 13th June, 1812, required to prove their titles to their lots, rest on the statute, and show the existence of those facts which are necessary to bring them within its provisions. So of those claiming under the act of confirmation of the 29th April, 1816. If the pre-emptor is prevented by the officers of government, or other causes beyond his control, from proving his claim during the existence of the act by which it is conferred, and clearly manifests a determination not to abandon by declaring a private sale, made under such circumstances, void, we do justice between the parties and conform our course to that which will be pursued by those in whose hand is the final disposition of the public lands. What measure of justice or policy can be subserved in lending our assistance to this plaintiff, whose title paper has been cancelled by the government, and who is assured he never will receive a title against one who is in possession, and whose claims are more meritorious?

Judge McBRIDE concurring, the judgment is reversed.

NAPTON, J., dissenting.

Hunter brought an action of ejectment against Allison in the circuit court of Pike county. Upon the trial, Hunter produced in evidence a receipt from the receiver of the land office at Palmyra, for the purchase money of the land in controversy, and proved the defendant Hunter in possession of the land.

The defendant then offered evidence, both oral and documentary, to prove:

1. That the land was reserved from sale.

2. That at the time of the plaintiff's entry, the land in controversy had never been offered at public sale, and consequently was not liable to private entry.

3. That the land in controversy was within the limits of the claim of Antoine Dubreuil, confirmed by act of Congress of 4th July, 1836, and that defendant derived title from Dubreuil.

4. That one Elihu Watson had a pre-emption right on the land, under the act of 29th May, 1830, and that said right had been conveyed by deed to said defendant; and

5. That said entry was fraudulent and illegal.

This proof was all rejected by the circuit court, but from the documents, and testimony of witnesses preserved by the bill of exceptions, the facts appear to have been as follows:

Allison vs. Hunter.

On the 11th of July, 1831, Hunter, the plaintiff, entered the east half of the S. E. qr. of S. 8, town. 58, R. 1. The register of the land office was absent at the time, but had left blank applications, with his si nature to them, in charge of the receiver, so as to enable the business of the office to be transacted in his absence. The register was a witness on the trial, and testified that Hunter, or his agent, had applied to him to enter the land, but that he had informed him it could not be entered, because of a private claim indicated on the maps in his office by feint pencil marks. The register states that, had he been present, he would not have permitted the entry; but he had gone to St. Louis on business, and was absent some ten days.

Elihu Watson had settled on this land in 1823. In December, 1830, he applied to the land officers for permission to prove up his pre-emption, under the act of May 29, 1830, but was refused, because of its being within the claim of Dubreuil, and consequently not subject to pre-emption. In September, 1832, the commissioner of the general land office, directed the register and receiver to take the proof of Watson's pre-emption, *nunc pro tunc*, and it was accordingly done, but not left on the files of the office. Watson, in 1835, sold his pre-emption right to the defendant Allison, and subsequently left the State. There was no proof offered of any title to Watson, either by certificate or patent, emanating from the United States.

On the 4th July, 1836, the claim of Antoine Dubreuil was confirmed by act of Congress. The 2d section of that act provided, "that if it shall be found that any tract or tracts confirmed as aforesaid, or any part thereof, had previously been located by any other person or persons under any law of the United States, or had been surveyed and sold by the United States, this act shall confer no title in opposition to the rights acquired by such location or purchase."

The defendant also claimed to have a derived title from Dubreuil.

It did not appear from the proof actually offered on the trial, whether this claim of Dubreuil was one of those which had been duly filed with the recorder, so as to be within the reservation of the act of Congress of 1811. But I assume that it was so filed, from the fact that the claim was acted on by the first board of commissioners.

There are three principal points arising in this case, all of which have been fully discussed at the bar, and each of which I propose to notice very briefly, to-wit:

*First.* The claim of Dubreuil,

*Second.* The pre-emption right of Watson, and

*Third.* The title of Hunter by his entry of 11th July, 1831.

48

1. On the 18th January, 1834, the commissioner of the general land office communicated to Congress the reports of the boards of commissioners, made under the act of 9th July, 1832, and the act of 2d March, 1833, and the action of Congress on these reports resulted in the act of July 4, 1836, confirming most of the claims, in favor of which the commissioners had reported.

In the report of the board, made on the 27th Nov., 1833, (Ex. Doc. 24th Cong., vol. 3, doc. 50,) the following statement and suggestions are made by the commissioners:

"Upon the subject of conflicting claims, we have been unable to ascertain to what extent they exist, &c., &c. We are of opinion, however, that they exist to a considerable degree. There are numerous cases of lands lying within these French and Spanish claims, belonging to individuals whose right or claim originated under the government of the United States; some depend upon purchases; some upon the law allowing pre-emption; some others upon New Madrid locations; and some again upon settlement rights which have been confirmed. Most of these persons have been for a long time settled on their lands. Their claims being of a *bona fide* character, derived from the government of the United States; they went on to improve their lands, making for themselves and families comfortable homes, without any belief that they ever would be interrupted in their possessions. Should the claims reported by the board be confirmed by Congress, in whole or in part, Congress will, in their wisdom, no doubt, notice the suggestion here made, and carve out such a course as will quiet the uneasiness and anxiety which are felt, by doing everything which even the most scrupulous demands of justice could require."

It was, doubtless, in conformity to these suggestions that the second section of the act of July 4, 1836, was framed, by which the rights of those who had located or purchased the confirmed claims, or any part thereof, by virtue of any law of the United States, were left unaffected by the act.

In the case of Stoddard vs. Chambers, 2 Howard 284, the Supreme Court of the United States, have held New Madrid locations not to be within the protection of the second section, unless located or patented during the interval in 1830 and '31, when the reservation by the act of 1811, did not operate. This opinion was based upon the principle that New Madrid locations placed upon lands reserved by act of Congress, were mere nullities—not voidable, but absolutely void. This court in the case of Sarpy vs. Papin, gave a different construction to that portion of the second section which relates to sales, relying on the be-

lief that the act was not designed to give any title, in opposition to *actual bona fide* sales by the government, or its officers, whether those sales were authorized by law or not.   When we consider the fact that these Spanish claims had been repeatedly rejected by the various boards of commissioners and public officers to whom they had been refeared by the government from 1805 up to 1832, as utterly destitute of any merit; that they had been barred from time to time by various acts of Congress until revived by the act of 1824, and afterwards by the acts of 1832 and 1833; that the action of the officers of government in relation to these claims, had been exceedingly contradictory and inconsistent; at times allowing locations and sales; at other times refusing them, according to the caprice of the officer, or of the department to which he belonged; and that in point of fact, hundreds of sales and locations had been made within the limits of these claims, the purchase money of which was in the coffers of the government; and that these innocent purchasers, unsuspicious of danger, and lulled into security by the action of the government, had settled on the lands so purchased, in good faith, and made extensive and valuable improvements.   When we look at these facts, notorious here, and communicated by the commissioners to Congress, is it unreasonable to suppose that Congress, in passing the second section of the act of 1836, designed something more than a mere mockery of protection?   If the sales and locations were made in accordance with law, the purchasers needed no protection.   Congress could not deprive them of title.   What motive could have operated on Congress to protect those purchasers who happened to make their entries, or get their patents, between the 26th May, 1830, and the 9th July, 1832, and leave those who had located or purchased from 1818 up to 1836, unprotected?   There was no particular merit in the entries and locations made at this interval, except that it so happened, probably without the knowledge of the officers or purchasers, that the reservation of the act of 1811, was at this period inoperative.

The decision of the Supreme Court of the United States *in terms* extends only to New Madrid locations; whether the same doctrine will be applied to entries at the land offices, does not appear.   The entry of Hunter was made on the 11th July, 1831.   At this time the land was not reserved from sale, and therefore the rule in Stoddard vs. Chambers, protects this entry from any title acquired by virtue of the act of 4th July, 1836.   So far, then, as the Dubreuil claim is concerned, I see no ground of objection to its exclusion by the circuit court.

2. The pre-emption right of Watson, if it had been proved and allowed in time, I should consider a sufficient title for the defence of this

action.   It may be further admitted that if the officers had permitted the proof of this pre-emption to have been taken subsequently to the expiration of the act of 1830, and the pre-emption right had assumed a tangible shape, either by entry or patent, it would have avoided the entry of Hunter.   But an entry of land subject to pre-emption, is not void; it is merely voidable.   The pre-emptor may never claim his pre-emption, and in that event the title of the purchaser has never been questioned.   This was the uniform construction given by the land department to the pre-emption law of 1830.   The government has not allowed Watson's pre-emption; it has not permitted him to enter the land or given him any evidence of title.   It does not appear that his rights ever will be recognized; they have, in fact, been forfeited by reason of the sale to Allison.

In an action of ejectment, such a title resting on an abandoned and forfeited equity, constitutes no solid foundation upon which to base a defence.

3. The defendant offered to show the illegality of Hunter's entry, *first*, by proving that the land had never been offered at public sale, and therefore was not subject to private entry; and *second*, by showing fraud.

Whether the register and receiver at Palmyra, ever complied with their duty in offering this land at public sale, before they permitted it to be purchased by private entries, is, in my opinion, a matter of no consequence whatever.   It is a regulation of the department, and, unquestionably, a very wise and salutary one, conducing to the interest of the purchasers, as well as of the proprietor, that reserved lands when brought into market shall first be offered at public sale, before private entries are permitted.   But even if this were a regulation by act of congress, and not resting on the mere usage of the agents of government, it would be only directory, and the validity of a sale would not be questioned, though made in contravention of the regulation.   It would produce a fearful instability in the land titles of this State, if the customary evidences of such title, the certificate of entry or the patent, could be successfully defeated, by showing that the agents of government who superintend these sales, have neglected to perform all the duties which the law prescribes.   Had it been contemplated that a compliance with this regulation should be considered as an essential prerequisite to the emanation of a valid title, it is remarkable that congress has not provided any means by which the fact can be ascertained. There is nothing in the records of the register's office, nothing in the records of the department at Washington, by which the fact can be as-

certained whether this land had ever been put up at public sale or not. Indeed we have on the record a voluminous correspondence between the heads of department and subordinate officers, from which an unsuccessful inquiry seems to have been instituted to ascertain this fact. It does appear, however, from a statement filed in the surveyor general's office, that entries upon this land, which is said to have been reserved and never offered for sale, were in fact made *during nearly every year from the year* 1818 *up to the year* 1844, amounting in all to *fifty-eight* entries. *Twenty* of these entries have been *patented. Nine* of them were made in the year 1831, one of which was on the 4th July of that year, and another on the 1st day of August, and a third and fourth on the 24th and 29th June. In short, entries were made in the months of April, May, June, July, August and December, 1831, and the entries made in the months of April and June are marked *patented.* Yet it is said that this land never was offered for sale, and the register, who was a witness in the case, is unable to give any satisfactory information on this subject, but says that had he been at the office on the 11th July, 1831, Hunter should not have been permitted to make his entry. Entries were permitted on the 24th, 25th and 29th June, and the 4th July and 1st August, 1831. The register might have refused to permit Hunter's entry on the ground of Watson's pre-emption, and very properly; but I see no reason for the refusal arising from the reservation of the land, or the failure to make public advertisement, which would not apply to all the other entries which appear to have been permitted during that year.

The defendant also offered to prove that Hunter's entry was fraudulent. That fraud vitiates the most solemn contracts, has become a maxim of the law; but it is difficult to conceive of any fraud which could affect the character of this transaction. If the sale was legal, it matters not how fraudulent may have been the motives or conduct of either the officers or purchaser. The fraud attempted to be proved in this case, was that Hunter took advantage of the register's absence, who had previously rejected his application, to make the entry. If the rights of any one else had been affected by this transaction, the person prejudiced might complain, but the pre-emptor, Watson, it seems, had met with the same fate as Hunter, and never succeeded in getting any title. His interests, if he has any now, are not in a shape to be available in his action.

The judment of the circuit court was, in my opinion, correct.